U.S. DISTRICT COURT
WESTERN DISTRICT of LOUISIANA
RECEIVED - ALEXANDRIA

MAR 0 6 2007

ROBERT H. SHEMWELL, CLERK
BY _____ DEPUTY

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

| | | |
|---|---|---|
| LOUIS JAMES TOTH, ET AL | : | DOCKET NO. 06-0998 |
| VS. | : | JUDGE TRIMBLE |
| CALCASIEU PARISH, ET AL | : | MAGISTRATE JUDGE WILSON |

### MEMORANDUM RULING

Before the Court is a "Motion to Dismiss by Harrah's" (doc. #18) filed by Harrah's Lake Charles, LLC, Harrah's Star Partnership, Players Riverboat II, LLC and Players Riverboat Management, LLC (collectively referred to as "Harrah's"). Movants seek to dismiss all of the claims filed by Plaintiffs, Louis James Toth, Jeffrey Dale Schmitz, Ronald Craig Moon, Bernadette Toth, Jennifer Schmitz and Carole Moon pursuant to Federal Rule Civil Procedure 12(b)(6).

### FACTUAL STATEMENT

Plaintiffs have named in their Complaint the following defendants: Calcasieu Parish, Calcasieu Parish Sheriff's Department, Harrah's Lake Charles, LLC, Harrah's Star Partnership, Players Riverboat II, LLC, Players Riverboat Management, LLC, Harrah's Casino Security Officer Jason Comeaux, Unknown Harrah's Casino Security Officers, Sheriff Tony Mancuso, in his official and individual capacities, Lieutenant David T. Snider with the Calcasieu Sheriff's Department, in his official and individual capacities, Sergeant Donald Snyder, in his official and individual capacities, Sergeant Todd Ory with the Calcasieu Parish Sheriff's Department, in his official and individual capacities, Sergeant Gene Pittman with the Calcasieu Parish Sheriff's Department, in his

official and individual capacities, Deputy Connor McLaughlin with the Calcasieu Parish Sheriff's Department, in his official and individual capacities, and Unknown Calcasieu Parish Sheriff's Department Deputies, Officers, and/or Employees, in their official and individual capacities.

Plaintiffs make the following allegations in their Complaint and Demand for Trial By Jury: On or about September 5, 2005, Mr. Toth, a resident of Michigan, became aware of the impact Hurricane Katrina, a category 5 hurricane, had made on Louisiana on or about August 29, 2005. Previously, on September 3, 2005, Mr. Toth made contributions to the American Red Cross. Shortly thereafter, Mr. Toth decided to get personally involved by transporting relief supplies to Louisiana to assist those in need.

On or about September 17, 2005, Mr. Toth heard news reports about Hurricane Rita, another category 5 hurricane, that was projected to make landfall in Louisiana. Mr. Toth asked two of his friends, Mr. Schmitz and Mr. Moon, if they wanted to join him in his efforts to transport relief supplies to Louisiana. Both agreed to help.

Mr. Toth had worked for approximately three years as an emergency medical technician in Detroit, Michigan. He had volunteered his services in Mobile, Alabama during Hurricane Ivan's aftermath in September 2004. During this storm, Mr. Toth's experience taught him to seek shelter in a parking deck, wear protective clothing, protect your face and head by wearing a hockey goalie's face mask and head protection gear, and to wear chest and leg protection gear.

On September 22, 2005, in preparation for their trip to Louisiana, Mr. Toth, Mr. Schmitz and Mr. Moon bought the following gear and equipment: full face-protective snowmobile helmets,

hockey leg guards, water skiing life vests, waist high boots, and raincoats.[1] On that same day, Mr. Schmitz rented a GMC Yukon SUV from Enterprise Rent-A-Car in Plymouth, Michigan,[2] and Mr. Toth, Mr. Schmitz, and Mr. Moon purchased relief supplies.[3] Plaintiffs loaded an emergency medical bag, their gear and clothes in the rental truck and began their journey on the evening of September 22, 2005.

Not knowing their exact destination, Plaintiffs intended to travel to the east side of the hurricane's eye wall because that is where the most destruction occurs. During their trip, Plaintiffs heard news reports of stranded evacuees, thus they decided to buy fuel and fuel containers.[4] Because their vehicle was full of supplies, Plaintiffs also had to buy a tote serviceable as a top vehicle carrier to transport the fuel.[5]

Based on news reports, Plaintiffs first decided to go to Port Arthur, Texas. On the evening of September 24, 2005, Plaintiffs were heading westbound on the I-10 expressway near Lake Charles, Louisiana. As they approached the area, they were struck with 70-mile-per-hour wind gusts. Because of large debris accumulated on the expressway, Plaintiffs' decided to find shelter in the Isle of Capri Casino's parking structure. However, as they approached the bridge leading to the Casino,

---

[1] Attached to their complaint are receipts for these purchases, Plaintiffs' Exhibits 2, 3, and 4.

[2] Attached to their complaint is the Enterprise Rent-A-Car Rental Agreement. Plaintiffs' Exhibit #6.

[3] Attached is a receipt for 20 cases of Aquafina water, batteries, three vests, rubber boots (Plaintiffs' Exhibit #3), nonperishable food and ice (Plaintiffs' Exhibit 6).

[4] Attached to their complaint are receipts, Plaintiffs' Exhibit #7.

[5] *Id.*

they found that it was blocked by a municipal vehicle and a school bus. Hence, they exited I-10 onto the service road. Plaintiffs immediately saw Harrah's six-story parking structure and sought refuge there.

After removing the tote from the top of their vehicle because of the low ceiling clearance, Plaintiffs parked their vehicle on Level 4. Plaintiffs then called their wives to assure them of their safety. Plaintiffs donned their protective gear and ascended the stairwell to the top deck of the parking structure. Realizing the dangerous conditions, they headed toward an empty parking lot east of the parking structure. They then walked along some water for a short time and saw a large building parallel to the water. Mr. Toth thought he saw someone in the building and informed his companions.

Mr. Moon walked up a ramp to the building and reached out and touched the door handle and stated to Mr. Toth and Mr. Schmitz, "You guys, look at this thing vibrate!" The trio then started walking back towards the parking lot. Mr. Toth noticed a piece of wood about 18 inches long and about a couple of inches around and showed Mr. Moon, commenting on the need to wear protective gear. When the men emerged from between the adjacent buildings appearing to be a hotel and a restaurant, they saw flashlights waving at them. Because they were walking against the wind, Mr. Toth and Mr. Moon lowered their face shields' helmets and could not hear anything. Mr. Schmitz heard the people holding the flashlights shouting to them to stop and warning that they would shoot if Mr. Schmitz and his companions took another step. However, because Mr. Toth and Mr. Moon could not hear, they continued walking. As they approached, Mr. Toth and Mr. Moon saw an individual holding a flashlight and a pistol. Mr. Toth, Mr. Moon and Mr. Schmitz all got down on the ground. Plaintiffs were then handcuffed and led into a building that appeared to be a hotel.

Some of the individuals identified themselves as police officers. Plaintiffs believe on information and belief that these individuals were Defendants, Jason Comeaux, Connor McLaughlin and Unknown Harrah Casino Security Officers. Once inside the motel, the Security Officers took Plaintiffs upstairs and immediately started calling them looters. The Security Officers kept guns trained on the Plaintiffs, and in particular, one gun was pressed against Mr. Toth's head. Mr. Toth was laid down on a carpeted floor with two Security Officers kneeling on his back and pointing guns at his head. These defendants included five or six security officers armed with an assault rifle, shotguns and handguns. One Security Officer bragged about knowing how to pop a person's shoulder out of its socket. This defendant lifted Mr. Toth's handcuffed arms almost to the point where his shoulders would pop out.

One of the Security Officers was a Caucasian male weighing approximately 170 pounds and about 5'10" tall, referred to as Leader A, and another was an African-American male referred to as Leader B, who weighed about 280-300 pounds and was approximately 6'3" tall. Leader A, who bragged about being a former police officer, began interrogating Plaintiffs which consisted primarily of accusations. Leader A inquired as to where Plaintiffs had taken (stolen) their clothes. Plaintiffs responded that they had paid for everything and had receipts available to show them. Ignoring Plaintiffs' responses, Leader A continued his accusations and interrogation.

Leader B then took over the accusations and interrogation. Plaintiffs told Leader B that they were businesspeople with business cards in their wallets. Leader B searched Plaintiffs' wallets and found their business cards, but exclaimed, "That doesn't mean shit, I can get a business card printed that says anything." He further exclaimed, "Don't you know we're under martial law down here? You have no rights."

Mr. Toth informed Defendants that he had $1,400.00 cash in his wallet and asked that they check his wallet, suggesting that looters do not carry that amount of cash and do not travel through five state with relief supplies into a hurricane area. He further suggested that looters are more likely to have criminal records. Leader B's response was that Plaintiffs were professional looters.

One of the Security Officers which was either McLaughlin, Comeaux or an Unknown Harrah Casino Security Officer, started swearing at Mr. Toth because while seizing Plaintiffs, that particular defendant had lost a brand new item – either a hand-held radio, walkie talkie or a flashlight. Mr. Toth asked these defendants to call his Church to confirm that Plaintiffs were on a humanitarian mission to help area residents. They refused and ordered Plaintiffs to remove their protective gear. After the Security Officers temporarily removed their handcuffs, Plaintiffs complied with the request. Even though these defendants had searched Plaintiffs outside the building, they searched them again and re-handcuffed them.

Mr. Toth, who was handcuffed with his arms behind his back, was then pushed into the corner of the room and commanded to get down on his hands and knees and face the wall. Mr. Moon and Mr. Schmitz were handcuffed with their arms in front, their ankles were duct-taped, and they were pushed into chairs. Leader A resumed his interrogation.

Leader A made threatening remarks about the next liar getting the butt end of his gun and continued questioning the men about where they had stolen their rain gear from. Again, Mr. Moon responded that they had purchased the gear and had receipts to show them. Leader A began screaming at Plaintiff so wildly that spit was flying from his mouth, exclaiming to the other defendants that "if any of you have a weak stomach, you better leave the room."

Leader A grabbed Mr. Moon by his handcuffs and started pulling him around the room,

6

crashing him into objects such as the entertainment center, the dresser and the wall. Leader A threw Mr. Moon to the floor after Mr. Toth made remarks about wanting to know the truth. Leader A then turned on Mr. Toth proclaiming, "Oh, we have a smart ass here! You're just a sarcastic big mouth, aren't you, boy?"

Leader A called the Sheriff on his cell phone and told him that they had caught three looters at Harrah's walking around with 2X4s and further asked, "Should I shoot 'em or throw them in the lake?" Leader A then announced that the Calcasieu Sheriff would like to meet him [Mr. Toth] and exclaimed: "He [Sheriff] loves a smart ass." He then told Plaintiffs that the Sheriff could not come, and that this would be their home for the next five days to a week.

Shortly thereafter, Leader A received a phone call on his cell phone. Plaintiffs overheard him say "OK, see you in a few, Sheriff." A short time later, Plaintiffs heard some people marching down the hall. Sheriff Department Defendants and an individual later identified as Agent Jones of the Federal Bureau of Investigation, then entered the room. One of these Defendants exclaimed, "Who is it? Show me which one!" This defendant, referred to as John Doe #1, grabbed Mr. Toth's handcuffs and jerked his inner forearm against Mr. Toth's throat. He then crushed Mr. Toth's throat so hard, he could not breathe. John Doe #1 yelled at Mr. Toth to get up and then lifted him up by his arms and pushed him forward intensifying the crushing of Mr. Toth's throat while preventing him from standing up. John Doe #1 shouted questions at Mr. Toth who could not answer due to the choking. He then pulled Mr. Toth up to his feet by his throat and continued to choke him. The other Sheriff Department Defendants and Agent Jones took Mr. Moon out of the room and had a security guard remove the duct tape from his ankles. These same defendants took Mr. Schmitz, without removing the duct tape from his ankles, forcing him to hop out of the room.

7

John Doe #1 forced Mr. Toth to the stairwell as he maintained his choke hold exclaiming, "There is no fucking way you are gonna make it to our jail alive! Do you hear me, boy?" Meanwhile, another Sheriff Department Defendant (John Doe #2) forced Mr. Schmitz to hop down the hallway. John Doe #2 asked John Doe #1 if Mr. Toth was resisting. John Doe #1 responded in the affirmative. John Doe #2 then pushed Mr. Schmitz to the floor and raced over to Mr. Toth and punched him in the left side of the ribs.

John Doe #2 then returned to Mr. Schmitz, grabbed his taped ankles and dragged him down four flights of concrete and metal stairs causing abrasions and contusions to his back. John Doe #1 dragged Mr. Toth down the stairs choking him and pulling on the back of his neck. Other Sheriff Department Defendants and Jones brought Mr. Moon down the stairs. The Sheriff Department Defendants and Jones put Plaintiffs in a Sheriff Department vehicle and transported them to the Calcasieu Jail.

During the ride to the jail, Mr. Toth tried to explain to John Doe #2 that they had come to Louisiana to bring relief supplies, and that if these Defendants would check their vehicle, they would find that it contained water, medical supplies, fuel and nonperishable foods. John Doe #2's response was that the Plaintiffs were looters, telling Mr. Toth to shut up.

When they reached the jail, Mr. Schmitz asked if they could call their wives. John Doe #2 then emptied Mr. Schmitz' pockets which contained $7.00 in cash and the receipt for two of the raincoats that Plaintiffs were accused of stealing.[6] John Doe #2 asked what the receipt was for, and Mr. Schmitz told him it was for the two raincoats. The Sheriff Department deputy looked at the receipt and put it in the property bag. The Sheriff Department deputy called Mr. Toth up to the desk.

---

[6] Attached to the complaint is a receipt for said raincoats, Plaintiffs' Exhibit 4.

Mr. Toth asked, "Don't we get a phone call?" The deputy responded, "No, the telephones are out." At that time, the phones were actually ringing.

Again, Mr. Toth asked the person at the desk if he would call his Church to confirm that the Plaintiffs were on a humanitarian mission. The deputy asked Mr. Toth to empty his pockets which he did. The deputy then called Mr. Moon up to the desk and asked him to empty his pockets which he did. Having nothing in his pockets, the deputy took Mr. Moon's wedding ring.

After processing, Plaintiffs were put in a jail cell. About five minutes later, one female and one male Defendant Sheriff Department jailer (also Sheriff Department Defendants) burst into the cell. The female jailer had the male jailer remove the mattresses from the cell, commenting that they were for paying customers only.

The next day, a Sheriff Department Defendant (a deputy, officer, employee or a jailer) appearing to be the head jailer arrived and announced, "We are playing it balls to the wall. You might as well get comfortable, because you're gonna be here for a week or two, and we will not be tolerating any shit! We will deal with any problems swiftly and harshly! If we have food, we'll feed you. If we have water, we'll give it to you. There's not gonna be much in the way of medical care, and you're just gonna have to deal with it. Do I make myself clear?" A few minutes later what appeared to be a jailer brought in Meals Ready to Eat ("MREs") and then left. Immediately thereafter, that same jailer returned and demanded that Plaintiffs return the MREs. They did so and the jailer left. About ten minutes later, he returned with only a few items of the MREs and said, "boss' orders." Over the next few days, Plaintiffs were fed bologna sandwiches, warm milk and some water. Plaintiffs complain of the conditions of the jail cell as being intolerably hot and humid with poor ventilation and filled with stench. Several requests were made by Plaintiffs to the jailers

9

to open a small window used to slide food to the prisoners to improve the ventilation. Almost all of the jailers refused. By the end of their second day of imprisonment, Plaintiffs' cell which had a maximum occupancy of seven, contained thirteen prisoners.

On Monday night, September 26, 2005, Sheriff Department Defendants (deputies, officers, or employees) escorted Plaintiffs and other prisoners to a courtroom in the jail. The presiding judge read the charges and stated that a public defender would be appointed to them even though Plaintiffs had previously told a jailer that they had the financial capability of hiring their own attorney. Plaintiffs were then escorted back to their cell and verbally informed that their bond had been set at $25,000 (Twenty-Five Thousand Dollars) each. On the afternoon of September 27, 2005, the Defendant Sheriff Department permitted Plaintiffs to make their first phone call since their arrest. Each of the Plaintiffs called their wives. Plaintiffs' bond[7] was posted on September 28, 2005 through a bail bond company, and Plaintiffs were released. The bondsman's employee gave Plaintiffs a ride back to Harrah's to retrieve their vehicle. Upon their arrival, Harrah's security team drove up and Leader B emerged from the security vehicle. Harrah's security followed Mr. Schmitz and Mr. Toth to Level 4 where they had left their vehicle. When Plaintiffs reached their vehicle, they discovered that one helmet, three sets of rain gear and three sets of hip high boots were missing. When Plaintiffs tried to reload the items such as beverages and the tote carrying the fuel containers filled with gasoline, they were warned by Harrah's security, "Don't push your luck." Heeding the warning, Plaintiffs got into their vehicle and left. After leaving some of the water and beverages at the bondsman's office, Plaintiffs began their journey back home to Michigan.

---

[7] The Plaintiffs' wives sent money via Western Union to a bail bond company in Calcasieu Parish. The fees for the bond were $24,844.00. Plaintiffs' Exhibits 9 and 10.

On April 20, 2006, the District Attorney for Calcasieu Parish announced that he had rejected all charges against Mr. Toth, Mr. Moon and Mr. Schmitz, stating that the "FACTS AS PRESENTED IN THE REPORT DO NOT CONSTITUTE LOOTING."[8]

Plaintiffs filed the instant suit on suit on June 13, 2006. Plaintiffs' causes of action include; (1) numerous constitutional violations against defendants, Calcasieu Parish, the Sheriff's Department and Sheriff Tony Mancuso, (2) various violations pursuant to 42 U.S.C. § 1983 against defendants, Calcasieu Parish, the Sheriff's Department, certain Sheriff Department defendants, Sheriff Tony Mancuso, Harrah's Casino, Jason Comeaux and Unknown Harrah's Casino Security Officers; (3) willful misconduct against defendants, Sheriff Tony Mancuso and Sheriff's Department defendants in their individual capacities, (4) false arrest/false imprisonment against defendants, Sheriff Tony Mancuso and all other Sheriff Department Defendants, (5) assault and battery against defendants, Sheriff Tony Mancuso and all other Sheriff Department Defendants, (6) intentional infliction of emotional distress against Sheriff Tony Mancuso and all other Sheriff Department Defendants, (7) willful misconduct against defendants, Harrah's Casino, Jason Comeaux and Unknown Harrah's Casino Security Officers, (8) false arrest/false imprisonment against defendants, Harrah's Casino, Jason Comeaux and Unknown Harrah's Casino Security Officers, (9) assault and battery against defendants, Harrah's Casino, Jason Comeaux and Unknown Harrah's Casino Security Officers, (10) intentional infliction of emotional distress against defendants, Harrah's Casino, Jason Comeaux and Unknown Harrah's Casino Security Officers, (11) gross negligence against defendants, Harrah's Casino, Jason Comeaux and Unknown Harrah's Casino Security Officers, (12) negligence against defendants, Harrah's Casino, Jason Comeaux and Unknown Harrah's Casino Security Officers, (13)

---

[8] Plaintiffs' Exhibits 11, 12 and 13.

civil conspiracy against defendants, Sheriff Tony Mancuso, Sheriff Department Defendants, Harrah's Casino, Jason Comeaux and Unknown Harrah's Casino Security Officers and (14) loss of consortium by Mrs. Toth, Mrs. Schmitz and Mrs. Moon against defendants, Sheriff Tony Mancuso, Sheriff Department Defendants, Harrah's Casino, Jason Comeaux and Unknown Harrah's Casino Security Officers.

## 12(b)(6) STANDARD

Federal Rule of Civil Procedure 12(b)(6) allows dismissal of a complaint when it fails to state a claim upon which relief can be granted. In considering a Rule 12(b)(6) motion, the Court must accept the factual allegations of the complaint as true and resolve any ambiguities or doubts regarding the sufficiency of the claim in plaintiff's favor.[9] "In order to avoid dismissal for failure to state a claim, a plaintiff must plead specific facts, not mere conclusory allegations. . . ."[10] "Legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss."[11] "[T]he complaint must contain either direct allegations on every material point necessary to sustain a recovery . . . or contain allegations from which an inference fairly may be drawn that evidence on these material points will be introduced at trial."[12]

## LAW AND ANALYSIS

*§ 1983 Claims*

---

[9] *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996); *Fernandez-Montes v. Allied Pilots Ass'n*. 987 F.2d 278, 284 (5th Cir. 1993); *Brumberger v. Sallie Mae Servicing Corp.*, 2003 WL 1733548, *1 (E.D. La. March 28, 2003).

[10] *Guidry v. Bank of LaPlace*, 954 F.2d 278, 281 (5th Cir. 1992).

[11] *Blackburn v. City of Marshall*, 42 F.3d 925, 931 (5th Cir. 1995).

[12] *Campbell v. City of San Antonio*, 43 F.3d 973, 975 (5th Cir. 1995).

Harrah's maintains that the 42 U.S.C. § 1983 claims must be dismissed because Plaintiffs have failed to plead sufficient facts to show state action by Harrah's. To recover under § 1983, Plaintiffs must:

> First, .... prove that the defendant has deprived him of a right secured by the 'Constitution and laws' of the United States. Second, the plaintiff must show that the defendant deprived him of a constitutional [or statutory] right 'under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory.' This second element requires that the plaintiff show that the defendant acted under color of law."[13]

The actions of private entities may only be deemed state action where the challenged conduct may be "fairly attributable to the State."[14]  The U.S. Supreme Court has developed tests for determining whether state action is present such as the public function test and the joint action test. "A private entity may be deemed a state actor when that entity performs a function which is traditionally the exclusive province of the state.[15] Detaining an individual suspected of stealing property alone is not performing a function "exclusively associated with the state.[16] However, a private contractor running a prison is performing such a public function.[17]

Plaintiffs maintains that Harrah's actions went far beyond mere detention because these Defendants not only detained Plaintiffs, but they judged them guilty, tormented and confined them,

---

[13] *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150, 90 S.Ct. 1598 (1970) *quoting* 42 U.S.C. § 1983; *Bass v. Parkwood Hospital*, 180 F.3d 234, 241 (5th Cir. 1999).

[14] *Lugar v. Edmunson Oil Co.*, 457 U.S. 922 (1982).

[15] *Wong v. Stripling*, 881 F.2d 200, 202 (5th Cir. 2003).

[16] *White v. Scrivner*, 594 F.2d 140, 143 (5th Cir. 1979).

[17] *Correctional Services Corp. v. Malesko*, 534 U.S. 61, 72 n.2, 122 S.Ct. 515, 151 (2001).

interrogated and investigated them and physically abused them. The Court agrees. Accepting the allegations in the Complaint as true, Harrah's went further than a mere detention of the Plaintiffs and took the law into their own hands by their interrogation and investigation methods, and their adjudication of the Plaintiffs. Accordingly, the facts in the Complaint sufficiently allege that Harrah's was a state actor or acted under color of state law and the § 1983 claims will not be dismissed.

*Willful Misconduct*

Harrah's maintains that Louisiana law does not recognize "willful misconduct" as a separate tort citing *Moses v. Butts*.[18] Plaintiffs argue that the Louisiana Supreme Court would recognize willful misconduct as an independent tort citing *Allen v. Thomson Newspapers, Inc., et al*,[19] and *Hontex Enterprises, Inc. v. City of Westwego*.[20] While the cases cited by Plaintiffs do talk about willful misconduct as it relates to libel and slander, and discretionary acts by state agencies, these cases do not recognize willful misconduct as a separate cause of action. As stated in the *Moses* case,

> . . . . Article 2315 of our Civil Code provides that every act whatever of man (whether deliberate, intentional, or merely negligent) that causes damages to another, obliges him by whose *fault* (not merely negligence) it happened to repair it. The act does not give rise to an action unless it is coupled with fault. This fault that causes the damage, may be deliberate, willful and intentional (in which case it may be a criminal offense) or it may be an act arising from mere negligence.[21]

Accordingly, the claim of willful misconduct will be dismissed.

---

[18] 70 So.2d 203, 206 (La.App. 1st Cir. 1954).

[19] 893 So.2d 227 (La.App. 3rd Cir. 2005).

[20] 833 So.2d 1234 (La.App. 5th Cir. 2003).

[21] Citing *Savoie v. Walker*, 183 So. 530, 533 (La.App. 1st Cir. 1938).

*False Arrest/False Imprisonment and Detention*

Harrah's maintains that it was entirely reasonable for its Security Officers to believe that "three men prowling Harrah's property in violation of a mandatory evacuation order and dressed in body armor had, or were about to, commit a crime."[22] Harrahs then argues that because it was reasonable to detain these men as they waited for the Sheriff's Department, the false arrest/false imprisonment claims should be dismissed.

"False imprisonment is the unlawful and total restraint of the liberty of the person."[23] The two essential elements are (1) detention of a person, and (2) the unlawfulness of such detention.[24] "Reasonable cause to arrest exists when facts and circumstances within the knowledge of the arresting officer, and of which he has reasonable and trustworthy information, are sufficient to justify a man of average caution in the belief that the person to be arrested has committed or is committing an offense."[25] False arrest and false imprisonment are not separate torts.[26]

Plaintiffs maintain that they have stated valid false arrest/false imprisonment claims and have plead all the required elements. Plaintiffs point to the following alleged facts: (1) they never entered Harrah's establishment, (2) they were passing through Calcasieu Parish, (3) they entered the parking

---

[22] Harrah's Memo., p. 11.

[23] *Kelly v. West Cash & Carry Bldg. Materials Store,* 745 So.2d 743, 750 (La.App. 4th Cir. 1999).

[24] *Restrepo v. Fortunato,* 556 So.2d 1362 (La.App. 5th Cir.), *writ denied,* 560 So.2d 11 (La.1990).

[25] *Callow v. City of New Orleans,* 1995 U.S. Dist. LEXIS 11215 (1995), quoting *Barry v. Dennis,* 633 So.2d 806, 808-809 (La.App. 4th Cir. 1994).

[26] *Kelly,* 745 So.2d 743, 761.

lot only because of the dangerous storm, (4) they were dressed as they were for hurricane relief work, (5) they told Harrah's Security Officers why they were in the area and offered to show them receipts.

The Court has reviewed the Complaint and taking the factual allegations as true concludes that Harrah's lacked both probable cause and reasonable cause to confine these Plaintiffs. Furthermore, Plaintiffs have sufficiently plead all the necessary elements for a valid claim of false arrest/false imprisonment.

*Assault and Battery*

Harrah's maintains that the force alleged to have been used by the Harrah's Security Team was not excessive under the circumstances. Harrah's suggests that because Plaintiffs "were spotted dressed in full combat gear, at night, at the height of Hurricane Rita, walking around an abandoned casino while one held a wooden club," the Security Team was justified in their actions towards these Plaintiffs.

A person "making a lawful arrest may use reasonable force to effect the arrest and detention and also to overcome any resistance or threatened resistance of the person being detained or arrested."[27] "Reasonable force" under this article "depends on the totality of the facts and circumstances in each case."[28] The factors used to determine if the force used was reasonable, include (1) the known character of the arrestee, (2) the risks and dangers faced by the officer, (3) the nature of the offense or behavior involved, (4) the chance of escape if the particular means are not employed, (5) the existence of alternative methods of arrest or subduing the arrest[ee], (6) the

---

[27] La. Code Cr. Pro. art 200.

[28] *Evans v. Hawley*, 559 So.2d 500, 503 (La.App. 2nd Cir. 1990), *writ or cert. denied*, 563 So.2d 1156 (1990).

16

physical size, strength and weaponry of the officers as compared to that of the arrestee, and (7) the exigencies of the moment.[29] Other factors include "whether the plaintiff was intoxicated, belligerent, offensive, or uncooperative."[30] The Court has reviewed the Complaint and concludes that considering the allegations as true, the Security Team used unreasonable force in detaining these Plaintiffs.

*Intentional Infliction of Emotional Distress*

Harrah's maintains that Plaintiffs' allegations do not rise to the level of intentional infliction of emotional distress. Plaintiffs assert that they have properly asserted valid intentional infliction of emotional distress claims against Harrahs as they have pleaded specific instances of extreme, outrageous, atrocious and intolerable conduct. Such a claim requires a plaintiff to prove that (1) the conduct of the defendant was extreme and outrageous, (2) the emotional distress suffered was severe, and (3) the defendant desired to inflict emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct.[31]

The Court has reviewed the Complaint and concludes that taking the allegations as true, Plaintiffs have plead sufficient facts to allege a valid claim of intentional infliction of emotional distress.

*Negligence*

Harrahs maintains that Plaintiffs have failed to plead sufficient allegations for gross

---

[29] *Id.* (citations omitted).

[30] *Id.* (citations omitted).

[31] *White v. Monsanton*, 585 So.2d 1205, 1209 (La.1991); *Nicholas v. Allstate Ins. Co.*, 765 So.2d 1017, 1022 (La.2000).

negligence and negligence pursuant to Louisiana Civil Code article 2315. "Gross negligence exists when there is such a disregard of the interest of others that the tortfeasor's conduct amounts to a gross deviation below the standard of care expected [of] a reasonable careful man under the circumstances."[32] Specifically, Security Officers have a common law duty to perform their functions "in a reasonable fashion and act as a reasonably prudent man under the circumstances."[33] For negligence, the elements are fault, causation and damages.[34] After reviewing the Complaint, the Court finds that considering the allegations as true, Plaintiffs have plead sufficient facts for claims of gross negligence and negligence.

*Civil conspiracy*

Harrah's maintains that plaintiffs' claims of "civil conspiracy" are without merit because Louisiana does not recognize an independent cause of action for "civil conspiracy."[35] Louisiana Civil Code article 2324 provides that "he who conspires with another person to commit an intentional or willful act is answerable in solido with that person for the damage caused by such act." The actionable element under the article is "the intentional tort the conspirators agreed to commit and committed in whole or in part, causing plaintiff's injury."[36] Considering the allegations in the Complaint as true, Plaintiffs have alleged sufficient facts to state a claim for a conspiracy to commit

---

[32] *Cole v. Dept. of Public Safety and Corrections,* 825 So.2d 1134, 1139-1140 (La.2002).

[33] *Arceneaux v. De La Rosa,* 889 So.2d 383, 388 (La.App. 3rd Cir. 2004), *writ denied,* 896 So.2d 1009 (2005).

[34] *Bailey v. Khoury,* 891 So.2d 1268, 1275 (La.2005).

[35] See *Ross v. Conoco., Inc.,* 828 So.2d 546, 552 (La.2002).

[36] *Rhyce v. Martin,* 828 So.2d 546 552 (E.D. La. 2001), quoting *Jefferson v. Lead Insustries Assoc.,* 930 F.Supp. 241, 247 (E.D. La. 1996) and La. Civ. Code art. 2324.

an underlying tort.

*Loss of Consortium*

Harrah's maintains that the Court should dismiss Plaintiffs wives' claims for loss of consortium because such liability can only be imposed if Harrah's is liable to Plaintiffs in some way. Because the Court has determined that most of Plaintiffs' claims are viable, we will not entertain dismissing the loss of consortium claims.

## CONCLUSION

For the reasons set forth above, the Motion to Dismiss by Harrah's will be granted in part and denied in part. The motion will be granted to the extent that Plaintiffs' claims of willful misconduct will be dismissed, otherwise the motion will be denied.

THUS DONE AND SIGNED in Chambers at Lake Charles, Louisiana, this 6th day of March, 2007.

JAMES T. TRIMBLE, JR.
UNITED STATES DISTRICT JUDGE