# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# LAKE CHARLES DIVISION

| | | |
|---|---|---|
| **LOUIS JAMES TOTH, ET AL** | : | **DOCKET NO. 06-0998** |
| **VS.** | : | **JUDGE TRIMBLE** |
| **CALCASIEU PARISH, ET AL.** | : | **MAGISTRATE JUDGE KAY** |

## MEMORANDUM RULING

Before the court for consideration is a Claim of Lien filed by former counsel for plaintiffs. Doc. 165. For reasons following we conclude the lien of Norman Yatooma & Associates, PC (hereafter "NYA") is recognized as binding, enforceable, and valid. The following discussion is offered for the benefit of any alternative dispute resolution referee or tribunal that may consider how and in what manner the fee may be distributed.[1]

The settlement proceeds in this matter are to be held in the registry of this court until we receive either an agreement between the parties as to how the proceeds will be distributed or a judgment from a Michigan court setting forth how the funds should be distributed.

## Facts and Procedural History

In August of 2005, "a series of hurricanes landed on the Gulf Coast. The first, and most devastating, was Hurricane Katrina, which hit the Gulf Coast on August 29, 2005, causing extensive and unprecedented damage to the city of New Orleans and the surrounding region." *In*

---

[1] Paragraph 14(d) of the agreement between the plaintiffs and NYA state as follows:
> This Agreement shall be governed by the laws of the State of Michigan, County of Oakland, which is hereby designated as the exclusive forum for the litigation of any disputes arising out of this Agreement.

Doc. 193, Att. 4, p.3.

*re PXRE Group, Ltd., Securities Litigation*, 600 F.Supp.2d 510, 515 (S.D.N.Y. 2009). Following Katrina, "looting and crime were rampant" throughout the city of New Orleans. *Reynolds v. New Orleans City*, 272 Fed.Appx. 331, 334 (5th Cir. 2008). Much of the national media coverage of the post-Katrina aftermath highlighted the looting throughout the city and the authorities' inability to prevent it. Kathleen Tierney, Christine Bevc, & Erica Kuligowski, *Metaphors Matter: Disaster Myths, Media Frames, and Their Consequences in Hurricane Katrina*, 604 ANNALS AM. ACAD. POL. & SOC. SCI. 57 (2006).

Hurricane Rita struck the City of Lake Charles, Louisiana, on September 23rd and 24th of 2005, causing severe damage as a result of the high winds and extreme weather conditions. *White v. State Farm Fire & Cas. Co.*, No. 07-1871, 2010 WL 760612, *1 (W.D. La. Mar. 2, 2010). Storm advisories were distributed nationally, and news of the storm was broadcast by all of the major news networks throughout the country.[2] According to their complaint, plaintiffs took notice of this media coverage and were "moved to help those in need . . . ." Doc. 1, p. 6.

The facts as laid out by this court in a previous Memorandum Ruling are as follows:

> On September 23, 2005, plaintiffs, Louis Toth, Jeffrey Schmitz and Ronald Moon, drove into an empty parking garage at Harrah's Lake Charles Casino and parked their vehicle. At the time there was a Mandatory Evacuation Order in place for the Parish of Calcasieu. Plaintiffs adorned themselves with hockey goalie face masks and head protectors, baseball catcher's chest protectors and other protection for their legs. While walking on the Harrah's property, Plaintiffs were apprehended by Connor McLaughlin, Harrah's Director of Securities and Facilities, and Jason Comeaux, Harrah's IT Manager. . . . At some point while Plaintiffs walked on the property, Louis Toth picked up either a stick or a two by four and was carrying this object when the men were apprehended. . . . Upon suspicion of looting, McLaughlin and Comeaux detained the Plaintiffs and took them in to one of the Casino's hotel rooms where they remained until they were transported to the Calcasieu Parish jail. Plaintiffs have made the following claims against Harrah's: 42 U.S.C. § 1983, willful misconduct, false arrest/

---

[2] *See* Robert R. Leben, George H. Born, & Margaret Srinivasan, *Satellite Altimetry Outreach During Hurricane Rita: Lessons Learned*, http://earth.esa.int/workshops/venice06/participants/995/paper_995_leben.pdf (last visited Feb. 8, 2010).

imprisonment, assault and battery, intentional infliction of emotional distress, gross negligence, negligence, civil conspiracy and loss of consortium.

*Toth v. Calcasieu Parish*, No. 06-0998, 2009 WL 1255347, *1 (W.D. La. May 6, 2009).

On January 3, 2007, defendants filed a motion to dismiss the suit pursuant to Fed. R. Civ. Proc. 12(b)(6). Doc. 18. That motion was granted in part by the district court as the plaintiffs did not plead sufficient facts to sustain a claim for willful misconduct. Doc. 32. On December 12, 2008, eight of the defendants named in the suit were dismissed for plaintiff's failure to effect service of process. Doc. 86.

On January 9, 2009, plaintiffs filed a motion for sanctions, arguing that defendants were destroying and concealing evidence. Doc. 114. The district court denied the motion. Doc. 141. On March 2, 2009, the Court issued a memorandum ruling and order denying plaintiffs' motion for reconsideration of a previously issued denial on a motion to extend deadlines. Doc. 140. At this point it becomes clear that the court was exasperated by plaintiffs' attorney, Mr. Robert S. Zawideh's, lack of candor toward the tribunal, as well as his dilatory tactics. According to the district judge when questioned, Mr. Zawideh offered multiple excuses as to why he would not be able to try the matter on the date scheduled. *See id.* Finding that "counsel had simply not properly prepared for the trial of the case," Judge Trimble denied plaintiffs' motion. *Id.* at p. 2.

On January 6, 2009, defendants filed a motion for summary judgment with the court. Doc. 109. Judge Trimble ruled for the defendants and dismissed plaintiffs' § 1983 and civil conspiracy claims as to defendant Harrah's. Doc. 152.

On June 19, 2009, Mr. Zawideh filed a motion to withdraw as counsel, citing an unpaid financial obligation on the part of his clients. Doc. 154. In this motion, Mr. Zawideh requested that,

> pursuant to the terms of the fee agreement and at common law, NYA [Mr. Zawidea's firm] asserts a general, possessory and retaining lien superior to

> all other liens and all special or charging liens known to common law for NYA's unpaid fees, costs, and expenses, on any money, property, or forgiveness of debt recovered in this matter from any source.

*Id.* at p. 4. After a conference with the plaintiffs [doc. 158], the motion was granted. Doc. 159. It was at this juncture that NYA filed is Claim of Lien. Doc. 165.

For purposes of later consideration of any remaining issues between these parties it bears noting that early on in the litigation the undersigned suggested that a settlement conference might be beneficial in disposing of the case and ordered the parties to confer and advise the court in this matter. Doc. 65. A settlement conference was set, at the agreement of the parties, but Mr. Zawideh later notified the court that he would only be able to attend the conference via telephone. Doc. 68. The court noted difficulties, however, in "hav[ing] meaningful discussions" with the multiple parties over the phone, especially considering that "the settlement conference was not ordered, but was scheduled because everyone agreed to participate." *Id.* The parties were advised to notify the court if another date and time would be mutually agreeable to the parties, but the court received no reply. *Id.* Through the ensuing months it became readily apparent that instead of attempting to settle, plaintiffs' counsel sought to litigate by moving forward with an extensive discovery battle. Numerous motions for discovery were filed, and several extensions were granted. The suit went forward for almost three years under the prosecution of Mr. Zawideh. Then, not coincidentally and as we point out below, very shortly after plaintiffs' *pro hac vice* counsel enrolled, settlement discussions resumed. *See* doc. 183. At the direction of plaintiffs' new counsel, a large portion of the suit was settled in under a month. Doc. 190. A few months later the remainder of the suit was settled. Doc. 211.

Plaintiffs subsequently hired Walter Sanchez to represent them, who was enrolled as counsel of record on February 3, 2010. Doc. 178. Shortly after enrolling, Mr. Sanchez successfully defended his clients' suit against a summary judgment attack levied by the

defendants. Doc. 180. Additional counsel enrolled *pro hac vice* and thereafter the parties requested that the undersigned host a settlement conference, which was held in chambers on February 25, 2010. Docs. 184 & 188.

As a result of this conference, plaintiffs were able to reach a settlement agreement with the governmental defendants. Doc. 190. On March 9, 2010, a settlement conference was held between plaintiffs and defendant Harrah's. Doc. 191. On December 22, 2010, the court was notified that Harrah's defendants had agreed to resolve all remaining disputes in this litigation. Doc. 211. On December 23, 2010, the action was dismissed without prejudice. Doc. 210.

Shortly after withdrawing as counsel, Mr. Zawideh caused to be filed in the record the instant "Notice of Claim of Lien." Doc. 165. The document was "accompanied by nothing and fail[ed] to state in the document what the proposed effect of that document should be or by what authority it is filed." Doc. 189. As a result, the court ordered Mr. Zawidea to file a memorandum explaining "what authority exists under federal law that supports the filing of this 'lien' and/or federal statutory authority that would allow him to create any sort of impediment to further disposition of this matter, whether disposition be by settlement, order, judgment, or otherwise . . . ." *Id.* Mr. Zawidea responded with a memorandum explaining the amount of work that he claimed to have done in this suit; over 430 pages documenting the $31,203.44 in costs and fees that he seeks to recover; and a one-page explanation of what a "claim of lien" is under Michigan law. Docs. 193 & 194.

## Law and Analysis

### 1. *Jurisdiction*

The federal courts are courts of limited jurisdiction. We possess only the power strictly authorized by the Constitution and statute. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). The court's jurisdiction cannot be expanded merely through judicial decree.

*Id.* "It is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Id.* (internal citations omitted). Because the underlying claims in this litigation are now settled and dismissed, this court's jurisdiction would ordinarily be extinguished. Any contractual dispute between the former attorney and the defendants, the former attorney's clients, or his clients' other lawyer, would be governed by state law. *Hogben v. Wyndham Intern., Inc.*, No. 05-20944, 2007 WL 2225970, *4 (S.D. Fla. Aug. 1, 2007). "That dispute gives rise to no claims arising under federal law." *Id.* Likewise, because plaintiff and NYA are residents of the State of Michigan, diversity of jurisdiction is lacking. Accordingly, this dispute is beyond the limited jurisdiction of this federal court. State courts, which do have general jurisdiction, would be the appropriate forum to litigate those disputes.

Of course, "a federal court may, in its discretion, exercise ancillary jurisdiction to hear fee disputes and lien claims between litigants and their attorneys when the dispute relates to the main action, regardless of the jurisdictional basis of the main action." *Marrero v. Christiano*, 575 F.Supp. 837, 839 (D.C.N.Y. 1983).

"[T]he doctrine of pendent jurisdiction is a doctrine of discretion, not of plaintiff's right, and that a decision that a federal court retains power to decide a case is only part of the analysis, not the end." *Curtis v. Sears, Roebuck & Co.*, 754 F.2d 781, 785 (8th Cir. 1985). Thus, "the question remains whether, as a matter of discretion, this power should be exercised." *Id.* Although "[d]istrict courts enjoy wide discretion in determining whether to retain supplemental jurisdiction over state claim once all federal claims are dismissed," *Noble v. White*, 996 F.2d 797, 799 (5th Cir. 1993), "[t]he 'general rule' is to decline to exercise jurisdiction over pendent state-law claims when all federal claims are eliminated from a case before trial." *Differential*

*Development-1994, Ltd. v. Harkrider Distributing Co.*, 470 F.Supp.2d 727, 756 (S.D. Tex. 2007) (citing *Certain Underwriters at Lloyd's, London v. Warrantech Corp.*, 461 F.3d 568, 578 (5th Cir. 2006) and *Smith v. Amedisys Inc.*, 298 F.3d 434, 477 (5th Cir. 2001)). Before doing so, however, this court must consider both the statutory provisions of 28 U.S.C. § 1367 and the balance of the relevant factors of judicial economy, convenience, fairness, and comity that the Supreme Court outlined in *Carnegie-Mellon University v. Cohill*, 484 U.S. 343, 350-51 (1988), and *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966).

First, pursuant to 28 U.S.C. § 1367:

[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

28 U.S.C. § 1367(a). A court "may decline to exercise supplemental jurisdiction" if: (1) the claim raises a novel or complex issue of State law; (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction. *Id.* at § 1367(c). Where the case clearly fits within one of these subsections, the court may decline to exercise supplemental jurisdiction. *Smith v. Clarke*, No. 03-3253, 2007 WL 710178, *2 (D. Neb. 2007).

The case here clearly fits within the third category, because it is a case in which "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). Additionally there are "other compelling reasons for declining jurisdiction," at least

over the dispute between plaintiffs, their first counsel, and possibly additional counsel,[3] and that is the agreement between plaintiffs and NYA which mandates a Michigan state court forum.[4] Thus, this court has statutory discretion to decline supplemental jurisdiction over this matter and does decline jurisdiction over resolution of any lingering disputes between these parties but does retain jurisdiction for the sole, limited purpose of determining validity of the lien.

## 2. *Propriety of the "Claim of Lien"*

Courts look to state "law to determine whether an attorney holds a lien for fees against a judgment or settlement amount." *U.S. v. Betancourt*, No. 03-0090, 2005 WL 3348908, *2 (S.D. Tex. Dec. 8, 2005); *see also Comet Rice, Inc. v. Robertshaw*, No. 92-0278, 1995 WL 1945551, *6 (N.D. Miss. Feb. 1, 1995) (applying state law to determine whether an attorneys lien on an award was valid); *Brothers in Christ, Inc. v. American Fidelity Fire Ins. Co.*, 680 F.Supp. 815, 818 (S.D. Miss. 1987) (same). Here, since NYA and its clients are both residents of Michigan, the contract was formed in Michigan, and plaintiffs and NYA have agreed that Michigan law governs any fee dispute, we look to Michigan law. Pursuant to Michigan law, courts begin with the premise that "[t]he law creates a lien of an attorney upon the judgment or fund resulting from his services." *Ambrose v. Detroit Edison Co.*, 237 N.W.2d 520 (1975) (citing *Wipfler v. Warren*, 128 N.W. 178 (1910); *Kysor Industrial Corp. v. D. M. Liquidating Co.*, 161 N.W.2d 452 (1968); and *Miles v. Krainik*, 167 N.W.2d 479 (1969)).

When an attorney withdraws from a case, however, his reasons for doing so determine whether the lien will be preserved. *Ambrose*, 237 N.W.2d at 488. "An attorney who withdraws from a suit without cause loses his inchoate right to a lien on the ultimate recovery . . . . But where an attorney is justified in refusing to continue in a case, he does not forfeit his lien for

---

[3] The court has been contacted by counsel for subsequent counsel inquiring into settlement proceeds but no formal appearance or request for relief has been made. See Doc. 212.
[4] See footnote 1.

services already rendered." *Id.* Here, according to NYA, "NYA moved to withdraw, because Plaintiffs had failed to fulfill their Engagement Agreement obligations to pay costs when incurred and billed." Doc. 194, p. 16. "A clear line of authority indicates that when . . . an attorney rightfully withdraws from a matter, recovery of attorney fees on a *quantum meruit* basis is appropriate." *Reynolds v. Polen*, 564 N.W.2d 467, 470 (Mich. App. 1997). Thus, if we were to find that NYA's motion for withdrawal was presented for the reasons that they assert, Mr. Zawideh's lien would be proper and a recovery on a *quantum meruit* basis would be applied.

On the other hand, "[a]ny lien an attorney may have may be lost by reason of his own misconduct and infidelity to his client's interests." 2 Robert L. Rossi, *Attorneys' Fees* § 12:25 (3d ed.) (citing *Poltronieri v. Talasco*, 204 N.Y.S.2d 613 (N.Y. App. Div. 1960) and *Robinson v. Rogers*, 257 N.Y.S. 737 (N.Y. App. Div. 1932)). Even where a court finds that an attorney has not acted with such "misconduct and infidelity" as to justify a total loss of lien, a recovery awarded pursuant to the *quantum meruit* standard may be substantially reduced by looking to the following factors: "(1) the professional standing and experience of the attorney; (2) the skill, time and labor involved; (3) the amount in question and the results achieved; (4) the difficulty of the case; (5) the expenses incurred; and (6) the nature and length of the professional relationship with the client." *Crawley v. Schick*, 211 N.W.2d 217, 222 (1973).

Our task is made no easier by the fact that the plaintiffs themselves are unrepresented on this issue and have not participated to allow the court the benefit of their position on why NYA withdrew and whether the withdrawal was warranted. Accordingly we are only left to assume that the representations made by NYA were accurate, their withdrawal was warranted, and that therefore they are entitled to assert their lien.

**Conclusion**

For the foregoing reasons, we conclude the lien of Norman Yatooma & Associates, PC (hereafter "NYA") should be and it is hereby recognized as binding, enforceable, and valid. The settlement proceeds in this matter are to be held in the registry of this court until we receive either an agreement between the parties as to how the proceeds will be distributed or a judgment from a Michigan court setting forth how the funds should be distributed.

THUS DONE this 1st day of May, 2011.

_____
KATHLEEN KAY
UNITED STATES MAGISTRATE JUDGE